In re MEXICO CITY AIRCRASH OF OCTOBER 31, 1979 Consolidated Proceedings.

Gary Steve HALEY, as heir and claimant of deceased Theresa Yoriko Sugano Haley, Gary Steven Haley, Special Administrator for the Estate of Theresa Yoriko Sugano Haley, Plaintiff-Appellant,

v.

WESTERN AIRLINES, INC., Defendant-Appellee.

Blanca Estela Paz TOVAR, heir and claimant of deceased Regina Patricia Tovar; Blanca Estela Paz Tovar, Special Administrator for the Estate of Regina Patricia Tovar, Plaintiff-Appellant,

Anthony John DZIDA, as heir and claimant of deceased Vikki Dzida, Anthony John Dzida, Special Administrator for the Estate of Vikki Dzida, Plaintiff-Appellant,

v.

WESTERN AIRLINES, INC., a Delaware corporation, McDonnell Douglas Company, Inc., a Maryland corporation; Estate of Charles Gilbert; Sperry-Rand, Inc., Sunstrand Data Control, Inc., a foreign corporation; Bendix Corporation, Flight Systems Division, a Delaware corporation; Rockwell International, Inc.; Collins Air Transport Division, a foreign corporation; Thompson, C.F.S., a foreign corporation, Defendants-Appellees.

Nos. 81–5695, 81–5724 and 81–5721.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 4, 1982.

Decided May 24, 1983.

Thomas J. Layden, Inglewood, Cal., for Hayley, et al.

Robert L. Wilson, Los Angeles, Cal., for Western Airlines, et al.

Before FLETCHER, PREGERSON and REINHARDT, Circuit Judges.

FLETCHER, Circuit Judge:

This is an appeal by the personal representatives of three employees of Western Airlines who were killed in the crash of a Western jetliner on October 31, 1979. The actions brought by the plaintiffs against Western Airlines and other defendants were dismissed by the district court on the ground that as the representatives of airline employees, the plaintiffs were limited to the exclusive remedies provided by the California worker's compensation statutes, Cal.Labor Code §§ 3201–3213. The plaintiffs appeal from the district court's ruling, contending that causes of action outside the worker's compensation statutes are provided by (1) the Federal Aviation Act, (2) the Warsaw Convention, and (3) the "dual capacity" doctrine of California law. The appellants further argue that genuine issues of material fact are presented with respect to all or some of these causes of action, and that dismissal of their claims was erroneous.

We affirm the judgment of dismissal as to the claims asserted by the representatives of two of the decedents, Haley and Tovar, who were flight attendants on duty aboard the plane that crashed. We reverse the dismissal of the claims asserted by representatives of the third decedent, Dzida, who was allegedly aboard the plane in a "deadheading" capacity while en route to a duty assignment on a flight originating in Mexico City, because there are genuine is-

sues of material fact concerning the cause of action that appellant Dzida has asserted under the Warsaw Convention.

## BACKGROUND

On October 31, 1979, Western Airlines Flight 2605 from Los Angeles crashed as it attempted to land at Mexico City Airport near Mexico City. Seventy-four persons aboard were killed. Among the victims were Theresa Haley, Regina Tovar, and Vikki Dzida.

On October 31, 1980, complaints were filed in the United States District Court for the Central District of California by three plaintiffs, one representing each of the decedents listed above. Each claimed damages for death and loss of property, both as heir and as personal representative.[1] The amended complaints of Haley and Tovar alleged that Theresa Haley and Regina Tovar had been "employees" aboard Flight 2605; Dzida's complaint alleged that Vikki Dzida was a "passenger" aboard the flight.

In each of the three suits, Western responded with a pleading entitled "Motion to Dismiss for Failure of the Complaint to State a Claim Upon Which Relief Can Be Granted; or, in the Alternative, for Summary Judgment." The theory of these motions was that the decedents had been Western employees and that the California worker's compensation statute, Cal.Labor Code §§ 3201–3213, provided the exclusive worker's compensation remedy that the decedents' estates might be entitled to collect. Accompanying each motion was an affidavit by Darlene Harris, Western's Manager of In-Flight Services, who served as the work coordinator for the decedents at the time of the accident. Harris's affidavits in the Haley and Tovar cases stated that both Theresa Haley[2] and Regina Tovar were on duty as flight attendants on Flight 2605, receiving full pay and full flight time cred-

it. In the Dzida case, Harris stated that Vikki Dzida

was an employee of Western Airlines, Inc., on October 31, 1979. She was a Los Angeles based Flight Attendant and, as such, was aboard Flight 2605. She was deadheading to Mexico City to work as a Flight Attendant aboard Western Flight 604, departing Mexico City at 8:55 a.m. on October 31, 1979.

The deceased received 100% of normal flight duty pay; plus 50% credit against her normal 80-hour per month duty assignment for her time aboard Flight 2605.

In response to Western's motions, the plaintiffs each asserted three sources of a right to recover damages despite the status of the decedents as Western employees. Under the "dual capacity" doctrine of California law, the plaintiffs claimed, an action could be maintained against Western on a products liability theory if Western contributed to the design or manufacture of the plane that crashed, even though an action could not be maintained based on Western's status as an employer. The other two theories of recovery were based on rights derived from federal law that the plaintiffs claimed preempted the exclusivity of the state worker's compensation remedy. The sources of federal law relied upon by the plaintiffs were the Federal Aviation Act, 49 U.S.C. §§ 1301–1542, and the Warsaw Convention, 49 Stat. 3000, T.S. No. 876, 137 L.N.T.S. 11.

Plaintiff Anthony Dzida opposed the motion to dismiss on the additional basis that his decedent, Vikki Dzida, was not aboard Flight 2605 in her capacity as a Western "employee," and that he was not, therefore, limited to a worker's compensation remedy. Dzida also requested the district court to grant him time to conduct discovery in order to investigate the circumstances of Vikki Dzida's presence on the flight.

---

1. This case does not involve any challenge to the capacity of these plaintiffs to assert the claims against Western that form the subject of this appeal.

2. Harris stated that Theresa Haley was listed in Western's records as Theresa Sugano, but acknowledged that the employee in question had recently been married and that the records had not been changed.

The district court granted Western's motion to dismiss,[3] ruling that all three decedents were acting in the course and scope of their employment at the time of the crash, and that the plaintiffs, as their representatives, are limited to the exclusive remedies of the California Labor Code. From this ruling, all three plaintiffs now appeal.

## DISCUSSION

■ The issues that we must determine are not simply whether some cause of action was available to the plaintiffs that would allow them to circumvent the limitation on remedies imposed by sections 3600 and 3601 of the California Labor Code, but also whether there existed any such cause of action over which the district court could properly exercise subject matter jurisdiction. The plaintiffs did not sufficiently allege diversity.[4] The district court had jurisdiction to entertain the action only if the plaintiffs' causes of action depended upon federal law. See 28 U.S.C. § 1331 (Supp. IV 1980); *Pan American Petroleum Corp. v. Superior Court,* 366 U.S. 656, 663, 81 S.Ct. 1303, 1307, 6 L.Ed.2d 584 (1961); *Gully v. First National Bank,* 299 U.S. 109, 112–13, 57 S.Ct. 96, 97–98, 81 L.Ed. 70 (1936). Only if such a federal question was raised by the complaint could the district court in each case consider whether to exercise pendent jurisdiction over state law claims. If the dismissal of the plaintiffs' federal claims was proper, then dismissal of the state claims was within the court's discretion. *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); *Hodge v. Mountain States Telephone and Telegraph Co.,* 555 F.2d 254, 261 (9th Cir.1977). The critical issue at this stage is whether the district court improperly dismissed any valid federal cause of action as to which there existed a genuine issue of material fact. See Fed.R.Civ.P. 56(c). We now consider that question.

### 1. *Federal Aviation Act.*

The Federal Aviation Act ("the Act"), 49 U.S.C. §§ 1301–1542 (1976 & Supp. IV 1980), is a detailed statute that governs civil aviation within the jurisdiction of the United States. Subchapter VI of the Act, 49 U.S.C. §§ 1421–1432 (1976 & Supp. IV 1980), entitled "Safety Regulation of Civil Aeronautics," confers extensive powers upon the Secretary of Transportation to prescribe standards and regulations concerning numerous aspects of civil aviation for the purpose of promoting safety.[5] Pur-

---

**3.** The district court judgments, copied verbatim from Western's proposed judgments, do not indicate whether the dismissals were for failure to state a claim, Fed.R.Civ.P. 12(b)(6), or summary judgments, Fed.R.Civ.P. 56(a). Since the judgments were based on Western's affidavits, we interpret them as summary judgments. *See* Fed.R.Civ.P. 12(b).

**4.** The essential elements of diversity jurisdiction, including the diverse residence of all parties, must be affirmatively alleged in the pleadings. *See Hodgson v. Bowerbank,* 9 U.S. (5 Cranch) 303, 3 L.Ed. 108 (1809); *Hodas v. Lindsay,* 431 F.Supp. 637, 640 (S.D.N.Y.1977). While the complaint of each plaintiff asserted the existence of diversity jurisdiction, each complaint also stated that the plaintiff is a resident of California and that Western Airlines is a corporation having its principal place of business in Los Angeles, California. Diversity jurisdiction was not, therefore, sufficiently alleged. 28 U.S.C. § 1332(a), (c) (1976).

**5.** For example, 49 U.S.C. § 1421(a) (1976) provides:

(a) *Minimum standards; rules and regulations*

The Secretary of Transportation is empowered and it shall be his duty to promote safety of flight of civil aircraft in air commerce by prescribing and revising from time to time:

(1) Such minimum standards governing the design, materials, workmanship, construction, and performance of aircraft, aircraft engines, and propellers as may be required in the interest of safety;

(2) Such minimum standards governing appliances as may be required in the interest of safety;

(3) Reasonable rules and regulations and minimum standards governing, in the interest of safety, (A) the inspection, servicing, and overhaul of aircraft, aircraft engines, propellers, and appliances; (b) the equipment and facilities for such inspection, servicing, and overhaul; and (C) in the discretion of the Secretary of Transportation, the periods for, and the manner in, which such inspection, servicing, and overhaul shall be made, including provision for

suant to this subchapter, the secretary has promulgated comprehensive rules and guidelines, published in volume 14 of the Code of Federal Regulations.

Subchapter IX of the Act provides for penalties to be imposed upon violators of the Act. and its regulations. Section 1471 allows civil penalties generally for violations of the Act,[6] while section 1472 discusses specific violations that give rise to criminal sanctions. However, the Act does not expressly create a private right of action in favor of persons injured as a result of Federal Aviation Act violations. The appellants urge that such a right of action should be implied from the safety-oriented provisions of the Act, its accompanying regulations, and the general intent of the Act to promote the safety of air travelers.

This court has not addressed the question whether a private remedy is available under the Federal Aviation Act for the representatives of persons killed in a commercial aviation accident.[7] Appellants rely on two district court decisions, *Gabel v. Hughes Air Corp.,* 350 F.Supp. 612 (C.D.Cal.1972), and *In re Paris Air Crash,* 399 F.Supp. 732 (C.D. Cal.1975), to support their position that a private right of action may be implied in the Act. In *Gabel,* Judge Pierson Hall concluded that representatives of decedents killed in an air crash may maintain a cause of action under the Act against the common carrier. 350 F.Supp. at 615. In *Paris Air Crash,* Judge Hall reexamined the issue in light of the Supreme Court's intervening decision in *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), and reached the same conclusion. 399 F.Supp. at 747–48.

This court has not been required to assess the holding of *Gabel* and *Paris.* In *Sanz v. Renton Aviation, Inc.,* 511 F.2d 1027 (9th Cir.1975) we considered whether personal representatives of decedents killed in an air crash could maintain a cause of action under the Act against the owner-lessor of an aircraft for the negligence of the pilot-lessee. We concluded that no federal cause of action existed on those facts. *Id.* at 1029.[8]

---

examinations and reports by properly qualified private persons whose examinations or reports the Secretary of Transportation may accept in lieu of those made by its officers and employees;

(4) Reasonable rules and regulations governing the reserve supply of aircraft, aircraft engines, propellers, appliances, and aircraft fuel and oil, required in the interest of safety, including the reserve supply of aircraft fuel and oil which shall be carried in flight;

(5) Reasonable rules and regulations governing, in the interest of safety, the maximum hours or periods of service of airmen, and other employees, of air carriers; and

(6) Such reasonable rules and regulations or minimum standards, governing other practices, methods, and procedure, as the Secretary of Transportation may find necessary to provide adequately for national security and safety in air commerce.

6. 49 U.S.C. § 1471(a)(1) (Supp. IV 1980) states in part:

(a)(1) Any person who violates (A) any provision of subchapter III, IV, V, VI, VII, or XII of this chapter or of section 1514 of this title or any rule, regulation, or order issued thereunder, or under section 1482(i) of this title, or any term, condition, or limitation of any permit or certificate issued under subchapter IV of this chapter, or (B) any rule or regulation issued by the Postmaster General under this chapter, shall be subject to a civil penalty of not to exceed $1,000 for each such violation, except that the amount of such civil penalty shall not exceed $10,000 for each such violation which relates to the transportation of hazardous materials. If such violation is a continuing one, each day of such violation shall constitute a separate offense.

7. No other circuit has squarely confronted the issue we must resolve. *Cf. Rauch v. United Instruments, Inc.,* 548 F.2d 452, 457–58 & n. 10 (3d Cir.1976) (finding no private right of action for potential air crash victims but explicitly not deciding whether actual victims of air crashes may maintain a cause of action). A number of circuits have denied a private right of action based on provisions of the Act unrelated to safety. *See, e.g., Diefenthal v. CAB,* 681 F.2d 1039, 1049–50 & n. 12 (5th Cir.1982). Two district courts have recently concluded that personal representatives of decedents killed in an air crash may not maintain a cause of action under the Act. *See Obenshain v. Halliday,* 504 F.Supp. 946, 949–51 (E.D.Va.1980); *Heckel v. Beech Aircraft Corp.,* 467 F.Supp. 278, 281 (W.D.Pa.1979). *See infra* note 12.

8. *See also McCord v. Dixie Aviation Corp.,* 450 F.2d 1129, 1130 (10th Cir.1971); *Rogers v. Ray Gardner Flying Serv.,* 435 F.2d 1389, 1391–95 (5th Cir.1970), *cert. denied,* 401 U.S. 1010, 91 S.Ct. 1255, 28 L.Ed.2d 546 (1971). These cases,

We neither rejected nor adopted the holding of *Gabel,* simply refusing to find a cause of action on differing facts.

In *World Airways, Inc. v. International Brotherhood of Teamsters,* 578 F.2d 800 (9th Cir.1978), we affirmed a district court order vacating part of a labor arbitrator's award requiring an airline to retrain and requalify a pilot who had been demoted for exercising poor judgment. *Id.* at 801. The court ruled that the authority of the arbitrator to shape a remedy was limited by the policy of the Federal Aviation Act, which allows and in fact requires airlines to create and maintain ability and performance standards for their pilots. To show why airlines should not be forced to employ pilots who cannot meet such standards, the court observed that "[f]ailure of an airline to comply with the provisions of the Federal Aviation Act and [its] regulations . . . can result in both administrative and civil penalties against the carrier. *See* . . . *In Re Paris Air Crash of March 3, 1974,* 399 F.Supp. 732, 747–48 (C.D.Cal.1975)." 578 F.2d at 803. Read in context, the statement in *World Airways* does not constitute an endorsement of the *Paris Air Crash* holding that a private right of action inheres in the Federal Aviation Act.

■■■ In the absence of pertinent Ninth Circuit authority, we look for guidance to Supreme Court cases that discuss the question of when it is proper to imply a private right of action in a federal regulatory statute. The basic issue is whether Congress intended to create such a private cause of action. *Middlesex County Sewerage Authority v. National Sea Clammers Association,* 453 U.S. 1, 13, 101 S.Ct. 2615, 2622, 69 L.Ed.2d 435 (1981); *California v. Sierra Club,* 451 U.S. 287, 293, 101 S.Ct. 1775,

1778–79, 68 L.Ed.2d 101 (1981). In *Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26 (1975), the Court listed four factors to be used to resolve this issue: [9]

First, is the plaintiff 'one of the class for whose *especial* benefit the statute was enacted' . . . ? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? . . . Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? . . . And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?

Beginning with the first of the *Cort* factors, we find it beyond dispute that the Federal Aviation Act was enacted by Congress in order to promote safety in aviation and thereby protect the lives of persons who travel on board aircraft. *See, e.g.,* 49 U.S.C. § 1421 (quoted *supra* in note 5). We agree with the appellants that Congress intended to benefit equally both airline passengers and employees, and that the plaintiffs' decedents cannot sensibly be excluded from the protected class simply because they were Western employees. The first part of the *Cort* test is therefore satisfied. This alone does not establish that Congress intended a private right of action to run in favor of the protected class members, however. We must search the Act for evidence of congressional intent to create such a right.

No such intent is manifested explicitly in either the Act or its legislative history. The appellants seek support for their claim

which denied recovery on a vicarious liability theory, went further than *Sanz* and stated in dicta that no private right of action is created by the Federal Aviation Act. *See McCord,* 450 F.2d at 1130; *Rogers,* 435 F.2d at 1393–94.

9. A number of members of the Supreme Court have expressed reservations about the four-part *Cort* test. *See, e.g., Sierra Club,* 451 U.S. at 302, 101 S.Ct. at 1783 (Rehnquist, J., concurring) (all four *Cort* factors need not be applied when the legislative intent has been determined);

*Cannon v. University of Chicago,* 441 U.S. 677, 749, 99 S.Ct. 1946, 1985, 60 L.Ed.2d 560 (1979) (Powell, J., dissenting) (the *Cort* four-part test should be abandoned). Nonetheless, the *Cort* factors "remain the 'criteria through which [legislative] intent should be discerned.'" *Sierra Club,* 451 U.S. at 293, 101 S.Ct. at 1779 (quoting *Davis v. Passman,* 442 U.S. 228, 241, 99 S.Ct. 2264, 2275, 60 L.Ed.2d 846 (1979)).

that Congress had such an intent in the savings clause incorporated in the Act, which states: "Nothing contained in this chapter shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies." [10] 49 U.S.C. § 1506 (1976). But section 1506 does not evidence any positive intent to create a private cause of action. It simply preserves private remedies that exist independent of the Act. In *Middlesex County Sewerage Authority v. National Sea Clammers Association,* 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981), the Supreme Court reversed a decision by the Third Circuit that found an implied right of action based on such a savings clause. *See id.* at 9, 101 S.Ct. at 2620. The Court held it incorrect for the court of appeals to rely upon an ambiguous savings clause while ignoring the extensive statutory enforcement scheme to which the language of the savings clause likely referred. *Id.* at 15–17, 101 S.Ct. at 2623–2625.

■ The Federal Aviation Act creates an extensive administrative enforcement scheme. 49 U.S.C. § 1471 provides civil penalties of $1,000 for each violation of the Act. Continuing violations are subject to fines of $1,000 per day. 49 U.S.C. § 1487 authorizes the Secretary of Transportation to seek injunctive relief in order to compel compliance with the Act. In light of these

statutory remedies, we must follow the "elemental canon of statutory construction that where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it." *Middlesex County Sewerage Authority v. National Sea Clammers Association,* 453 U.S. 1, 14–15, 101 S.Ct. 2615, 2623–24, 69 L.Ed.2d 435 (1981); *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 19, 100 S.Ct. 242, 246, 62 L.Ed.2d 146 (1979); *see also Touche Ross & Co. v. Redington,* 442 U.S. 560, 574, 99 S.Ct. 2479, 2488, 61 L.Ed.2d 82 (1979). Because of the Act's emphasis on administrative regulation and enforcement, we conclude that "it is highly improbable that 'Congress absentmindedly forgot to mention an intended private action.'" *Transamerica Mortgage Advisors,* 444 U.S. at 20, 100 S.Ct. at 247 (quoting *Cannon v. University of Chicago,* 441 U.S. 677, 742, 99 S.Ct. 1946, 1981, 60 L.Ed.2d 560 (1979) (Powell, J., dissenting)); *see Diefenthal v. CAB,* 681 F.2d 1039, 1049 (5th Cir.1982) (the Act's detailed administrative enforcement scheme, together with private right to seek injunctive relief in some cases, provides strong evidence that Congress did not intend a private cause of action for damages).

■ The appellants have not cited, nor have we uncovered, any legislative history indicating that Congress intended to create a private right of action in the Federal Aviation Act.[11] We have likewise concluded that the Act itself yields no evidence of

10. Congress never expanded on the meaning of this section. *See* H.R.Rep. No. 2360, 85th Cong., 2d Sess. 18–19, *reprinted in* 1958 U.S. Code Cong. & Ad.News 3741, 3758; H.R.Rep. No. 2254, 75th Cong., 3d Sess. 11–12 (1938). Courts have differed over exactly what congressional intent can be gleaned from that section. *Compare Obenshain v. Halliday,* 504 F.Supp. 946, 950 (E.D.Va.1980) (section not intended to create a private cause of action but simply to preserve state causes of action) *with Gabel v. Hughes Air Corp.,* 350 F.Supp. 612, 617 (C.D.Cal.1972) (section reveals congressional intent to provide private rights and remedies in addition to state law).

11. However, there is some evidence that members of Congress do not believe that any such private right exists. In 1968 and 1969 Congress considered various bills that would have created, among other things, an exclusive fed-

eral private cause of action arising out of certain aircraft crashes. *Aircraft Crash Litigation: Hearings on S. 961 Before the Subcomm. on Improvements in Judicial Machinery of the Senate Comm. on the Judiciary,* 91st Cong., 1st Sess. 217 (1969); *Aircraft Crash Litigation: Hearings on S. 3305 and S. 3306 Before the Subcomm. on Improvements in Judicial Machinery of the Senate Comm. on the Judiciary,* 90th Cong., 2d Sess. 5–6 (1968); *see generally* Note, *Aircraft Crash Litigation,* 38 Geo.Wash.L. Rev. 1052 (1970). Although the bills were never enacted, the logical implication from Congress's consideration of the issue is that it believed that the Act did not provide a private cause of action. We are mindful of the admonition that "'the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one.'" *Andrus v. Shell Oil Co.,* 446 U.S. 657, 666 n. 8, 100 S.Ct. 1932, 1938 n. 8, 64 L.Ed.2d 593 (1980) (quoting *United*

such an intent. Therefore, the second and arguably most significant part of the *Cort* test, whether there is any indication of a congressional intent to create a private right of action, is unsatisfied. We need not proceed further to conduct the third and fourth steps of the *Cort* analysis. *See California v. Sierra Club,* 451 U.S. 287, 298, 101 S.Ct. 1775, 1781, 68 L.Ed.2d 101 (1981) (the final two factors are relevant only if the first two factors evidence congressional intent to contain a remedy). We conclude that the Federal Aviation Act does not contain an implied private right of action.[12]

*States v. Price,* 361 U.S. 304, 313, 80 S.Ct. 326, 332, 4 L.Ed.2d 334 (1960)). The court has also indicated that "while arguments predicated upon subsequent congressional actions must be weighed with extreme care, they should not be rejected out of hand as a source that a court may consider in the search for legislative intent." *Shell,* 446 U.S. at 666 n. 8, 100 S.Ct. at 1938 n. 8. We thus consider the later Congressional interest in creating a federal private cause of action as some indication that the earlier Congress did not intend to create a private cause of action under the Act.

12. Our decision comports with the majority of cases that have dealt with this issue. *Compare In re Paris Air Crash of March 3, 1974,* 399 F.Supp. 732, 747 (C.D.Cal.1975); *Gabel v. Hughes Air Corp.,* 350 F.Supp. 612, 615–23 (C.D.Cal.1972), *and Neiswonger v. Goodyear Tire & Rubber Co.,* 35 F.2d 761, 762 (N.D.Ohio 1929) (Air Commerce Act of 1926) (upholding right of action) *with Obenshain v. Halliday,* 504 F.Supp. 946, 950–51 (E.D.Va.1980); *Heckel v. Beech Aircraft Corp.,* 467 F.Supp. 278, 280–81 (W.D.Pa.1979); *Yelinek v. Worley,* 284 F.Supp. 679, 681 (E.D.Va.1968); *Moungey v. Brandt,* 250 F.Supp. 445, 453 (W.D.Wis.1966); *Porter v. Southeastern Aviation, Inc.,* 191 F.Supp. 42, 43 (M.D.Tenn.1961); *Moody v. McDaniel,* 190 F.Supp. 24, 27–29 (N.D.Miss.1960) *and Mozingo v. Consolidated Constr. Co.,* 171 F.Supp. 396, 398–99 (E.D.Va.1959) (all denying private right of action under Federal Aviation Act for wrongful death or personal injury). Other cases reached the same result under the Civil Aeronautics Act of 1938.

Our result also accords with the majority of recent decisions, including a case from this circuit, that deny any private right of action under portions of the Act dealing with matters other than safety. *Compare Chumney v. Nixon,* 615 F.2d 389, 395 (6th Cir.1980) (Federal Aviation Act creates private right of action against airline for failing to prevent assault by passenger); *Fitzgerald v. Pan American World Airways, Inc.,* 229 F.2d 499, 501–02 (2d Cir. 1956) (Civil Aeronautics Act of 1938 creates

### 2. Warsaw Convention.

Appellants argue that even if no federal cause of action is created by the Federal Aviation Act, they can maintain a federal action based on the Warsaw Convention.[13] There is no dispute that the Convention applied to Flight 2605, an international flight. *See* Warsaw Convention, art. 1. The only questions are whether the Convention as a federal treaty creates an independent cause of action in favor of the survivors of persons killed in a plane crash, and if so, whether that cause of action is available

implied right of action for racial discrimination by common air carrier), *and Laughlin v. Riddle Aviation Co.,* 205 F.2d 948, 949 (5th Cir.1953) (C.A.A. creates right of action by pilot to recover wages due under an NLRB decision) *with Montgomery v. American Airlines, Inc.,* 637 F.2d 607, 610 (9th Cir.1980) (Federal Aviation Act vests no right of action to challenge free transportation provided to employees of airline subsidiary in persons other than Civil Aeronautics Board), *cert. denied,* 450 U.S. 920, 101 S.Ct. 1368, 67 L.Ed.2d 347 (1981); *Diefenthal v. CAB,* 681 F.2d 1039, 1048–51 (5th Cir.1982) (Act does not create private right of action to challenge airline regulation of smoking); *Kodish v. United Air Lines, Inc.,* 628 F.2d 1301, 1302–03 (10th Cir.1980) (Act creates no private right of action to challenge age discrimination in pilot selection); *Caceres Agency, Inc. v. Trans World Airways, Inc.,* 594 F.2d 932, 933 (2d Cir.1979) (Act creates no private right of action to remedy preferential discrimination among travel agents); *Wolf v. Trans World Airlines, Inc.,* 544 F.2d 134, 136–38 (3d Cir. 1976) (Act creates no private right of action to remedy deceptive practices by airline), *cert. denied,* 430 U.S. 915, 97 S.Ct. 1327, 51 L.Ed.2d 593 (1977) *and Danna v. Air France,* 463 F.2d 407, 410 (2d Cir.1972) (Act creates no private right to challenge fare discrimination in favor of youths absent prior CAB determination that practice is wrongful).

13. The Warsaw Convention ("the Convention"), formally titled the Convention for the Unification of Certain Rules Relating to International Transportation by Air, was created on October 12, 1929, and was adhered to by the United States on June 15, 1934. The official text of the treaty is in French and is published at 49 Stat. 3000 (1934). An English translation is published at 49 Stat. 3014 (1934), and also reprinted in T.S. No. 876, 137 L.N.T.S. 11 and 49 U.S.C. § 1502 note (1976). Except where otherwise indicated, the references below are to the articles of the English translation of the Convention contained in the foregoing sources.

to the appellants, who are the survivors of Western employees rather than regular ticketed passengers.

### a. *Does the Warsaw Convention Create a Cause of Action for Wrongful Death?*

The question whether a wrongful death cause of action was created by the Warsaw Convention is fundamentally different from the question whether such a cause of action was created by the Federal Aviation Act. Unlike the Federal Aviation Act and the statutes considered in *Cort v. Ash* and its Supreme Court progeny, the Warsaw Convention is not a regulatory law. Rather, it specifically addresses the scope of liability of air carriers in private suits filed by persons who suffer damages during the course of air transportation. Our inquiry is therefore much narrower: Did the Warsaw Convention merely create a set of substantive legal principles of liability, or did it also create a right to recover according to those principles?

Courts that have examined the issue have reached differing answers. The operative provision that most have considered central is article 17 of the Convention, which states:

> The carrier shall be liable for damage sustained in the event of the death or wounding of a passenger or any bodily injury suffered by a passenger, if the accident which caused the damage so sustained took place on board the aircraft or in the course of any of the operations of embarking or disembarking.

The first American court to consider the effect of Article 17 was the Southern District of New York in *Choy v. Pan American Airways Co.,* 1941 Am.Mar.Cas. 483 (S.D.N.Y.), which held that the Convention does not create a cause of action, with the following explanation:

> There is no enabling act vesting the ownership of the cause of action stated by the Warsaw Convention nor even stating who may be thought to be injured by a death and, though the liability stated in Article 17 is part of the treaty which was adopted, we do not understand how it can be defined or enforced without statutory assistance, which it has not as yet received.

*Id.* at 488. The court's conclusion was thus premised upon the rule, peculiar to common law jurisdictions, that the survivors of a person wrongfully killed hold no right of action absent a specific statute that prescribes such recovery and names the persons entitled to share in it. *See The Harrisburg,* 119 U.S. 199, 213, 7 S.Ct. 140, 146, 30 L.Ed. 358 (1886).

The New York Supreme Court followed *Choy* in *Wyman v. Pan American Airways, Inc.,* 181 Misc. 963, 43 N.Y.S.2d 420, 423 (Sup.Ct.1943), aff'd, 293 N.Y. 878, 59 N.E.2d 785, *cert. denied,* 324 U.S. 882, 65 S.Ct. 1029, 89 L.Ed. 1432 (1944).[14] But in a later case, *Salamon v. Koninklijke Luchtvaart Maatschappij, N.V.,* 107 N.Y.S.2d 768, 771 (Sup. Ct.1951), aff'd, 281 A.D. 965, 120 N.Y.S.2d 917 (A.D.1953), the court reached the opposite result. Without citation to the earlier cases, it based its holding upon the observation that "[i]f the Convention did not create a cause of action in Art. 17, it is difficult to understand just what Art. 17 did do." *Id.* at 773.[15]

The Southern District of New York again considered the issue in *Komlos v. Compagnie Nationale Air France,* 111 F.Supp. 393 (S.D.N.Y.1952), *rev'd on other grounds,* 209 F.2d 436 (2d Cir.1953). Judge Leibell in that case rejected the court's conclusion in *Salamon,* relying primarily upon the text of a letter from Secretary of State Cordell Hull to President Roosevelt describing the Convention. Secretary Hull wrote:

> The effect of article 17 (ch. III) of the Convention is to create a presumption of liability against the aerial carrier on the mere happening of an accident occasioning injury or death of a passenger subject

---

**14.** The court in *Wyman* did not elaborate any further rationale for declining to find a cause of action in the Convention.

**15.** The *Salamon* court also cited articles 20, 21, 27, 28, 29, 32, and 33 in support of its conclusion. 107 N.Y.S.2d at 772.

to certain defenses allowed under the Convention to the aerial carrier.

*Komlos,* 111 F.Supp. at 401–02 (quoting 1934 U.S.Av.Rep. 239, 243 (letter of Secretary Hull)).[16] Because Secretary Hull's letter stated merely that article 17 created a "presumption of liability," and not a "cause of action," Judge Leibell reasoned that the Convention does not in fact give rise to any independent cause of action. *See id.* at 401. However, the opinion ultimately equivocates concerning this conclusion, since it later suggests that a separate right of action *would* stem from the Convention in the situation where an accident occurs in a forum that does not provide any cause of action for wrongful death. *Id.* at 402.[17]

Although the Second Circuit reversed the district court decision in *Komlos,* it did not disturb or even mention its conclusion on the Warsaw Convention cause of action issue. *Komlos v. Compagnie Nationale Air France,* 209 F.2d 436 (2d Cir.1953). The Second Circuit did become the first circuit to discuss the question in *Noel v. Linea Aeropostal Venezolana,* 247 F.2d 677 (2d Cir.), *cert. denied,* 355 U.S. 907, 78 S.Ct. 334, 2 L.Ed.2d 262 (1957). In that case, Judge Lumbard writing for the court relied upon

the "presumption of liability" language of Secretary Hull's letter and the earlier implicit affirmance in *Komlos* to conclude that the Warsaw Convention did not supply the plaintiff with a federal cause of action. *Id.* at 679. The court in *Noel* further rejected Judge Leibell's statement in *Komlos* that the Convention provides a stopgap cause of action in situations where the place of injury does not. *Id.* at 679–80.

The *Noel* decision met sharp criticism from commentators. A major article questioning the wisdom of *Komlos* and *Noel* appeared in the Harvard Law Review. Lowenfeld & Mendelsohn, *The United States and the Warsaw Convention,* 80 Harv.L.Rev. 497, 517–19 (1967). The chairman of the United States delegation sent to the Hague on a mission to raise the liability limits of the Warsaw Convention argued strenuously that *Noel* is wrong and that the Convention creates an independent contract right of action for wrongful death. Calkins, *The Cause of Action Under the Warsaw Convention,* 26 J. Air L. & Com. 217 (1959). Yet the Ninth Circuit, in a dictum designed to support its resolution of a collateral issue, cited *Noel* and *Komlos* for the proposition that "the Warsaw Convention

**16.** Secretary Hull's letter went on to discuss other aspects of the liability principle embodied in article 17:

The burden is upon the carrier to show that the injury or death has not been the result of negligence on the part of the carrier or his agents. It is understood that while this rule has been adopted in some jurisdictions in this country in aircraft accident cases upon the theory of res ipsa loquitur, in certain other jurisdictions in this country the old common-law rule has been applied in accident cases arising in air transportation, so that the passenger or his legal representative has had the burden of proving negligence in the operation of the aircraft, before the carrier could be held liable for damages. The principle of placing the burden on the carrier to show lack of negligence in international air transportation in order to escape liability, seems to be reasonable in view of the difficulty which a passenger has in establishing the cause of an accident in air transportation. 1934 U.S.Av.Rep. at 243.

**17.** The relevant portion of the opinion states: The effect of Article 17 of the Warsaw Convention seems to be this:

If the decedent meets his death in the course of an "international transportation," as that term is defined in Article 3 of the Convention, then if the place of the accident is within a nation that has not adhered to the Warsaw Convention and has its own statute for wrongful death actions, the conditions and limits of the Convention, including Article 24(2), would nevertheless be applied in a suit for wrongful death in a forum specified as a proper forum under Article 28 of the Convention. But if the law of the place of the accident does not provide for a right of action for wrongful death, the forum would apply Article 17 of the Convention; and under those circumstances it might be said that Article 17 created the right of action for wrongful death. Under those circumstances, it may also be said that the right of action, even though its gravamen is ex delicto, arises out of the contract of carriage which made the Rules and Regulations of the Warsaw Convention applicable to the international transportation.

111 F.Supp. at 402.

does not create a cause of action, but merely creates a presumption of liability if the otherwise applicable substantive law provides a claim for relief based on the injury alleged."[18] *Maugnie v. Compagnie Nationale Air France,* 549 F.2d 1256, 1258 n. 2 (9th Cir.), *cert. denied,* 431 U.S. 974, 97 S.Ct. 2939, 53 L.Ed.2d 1072 (1977). Lower courts also considered *Noel* and its predecessors to establish that the Convention creates no independent cause of action.[19] *See, e.g., Husserl v. Swiss Air Transport Co.,* 388 F.Supp. 1238, 1243 (S.D.N.Y.1975); *Notarian v. Trans World Airlines, Inc.,* 244 F.Supp. 874, 877 (W.D.Pa.1965).

Then the Second Circuit decided *Benjamins v. British European Airways,* 572 F.2d 913 (2d Cir.1978), *cert. denied,* 439 U.S. 1114, 99 S.Ct. 1016, 59 L.Ed.2d 72 (1979). Writing for the majority in a 2–1 decision, Judge Lumbard overruled his own opinion in *Noel,* and held that the Warsaw Convention does create an independent cause of action for wrongful death. *Id.* at 916. The court based its resolution of the issue on three primary arguments.

First, and most importantly, it stressed that the overriding policy goal embodied in the Convention is the desire to formulate a uniform and universal set of legal rules to govern international air transportation.[20] Even if a requirement that a plaintiff find some domestic law cause of action for wrongful death would not literally contradict this policy, the court reasoned, such a requirement is "inconsistent with its spirit." *Id.* at 917–18. The court noted that "after *Noel,* not even the total lack of an appropriate cause of action at domestic law would permit an action to be founded on the Convention itself." *Id.* at 918 n. 9. Judge Lumbard concluded that the Convention should be interpreted so as to eliminate this potential source of inconsistency, in order best to effectuate its purpose. *Id.* at 918.

Second, the court drew support for its holding that a cause of action for wrongful death is supplied by article 17 from article 30(3) of the Convention. This article has been held to create a treaty right of action for a passenger whose baggage is lost where more than one carrier is involved. *See Seth v. British Overseas Airways Corp.,* 329 F.2d 302, 305 (1st Cir.), *cert. denied,* 379 U.S. 858, 85 S.Ct. 114, 13 L.Ed.2d 61 (1964). The *Benjamins* majority reasoned, in effect, that the Convention operates the same way even if only one carrier is involved and the damage is inflicted upon passengers, not baggage. 572 F.2d at 918.

Finally, the court felt compelled by evidence of the way Great Britain, the only other common law signatory with a general rule against wrongful death recovery, chose to implement the Convention. Great Britain, immediately after ratifying the Convention, enacted legislation that included the following provision:

---

**18.** The context of the quoted passage shows that the court's statement was not in the nature of a holding. The issue in *Maugnie* was whether the plaintiff had been injured in the course of "disembarking" within the meaning of article 17 of the Convention. The plaintiff cited *Noel* to support her argument that because federal jurisdiction was based solely on diversity, the court should look to state law to determine the meaning of the term. The court acknowledged the holding of *Noel* that the Warsaw Convention does not create an independent cause of action. 549 F.2d at 1258 n. 2. But the court rejected the substance of the plaintiff's argument, ruling that the Warsaw Convention is a source of federal law which displaces any rule of state law within the scope of its coverage. That the Warsaw Convention does not create a cause of action was thus in no way necessary to or involved in the decision in *Maugnie.*

**19.** Commentators also believed that the issue had been settled, even though they sometimes criticized the rule. *See, e.g.,* Lowenfeld & Mendelsohn, *The United States and the Warsaw Convention,* 80 Harv.L.Rev. 497, 519 (1967); Note, *Air Passenger Deaths Resulting From Injuries Sustained On or Over the High Seas, and at Unknown Places; Including Considerations of the Death on the High Seas Act, of the Warsaw Convention, and of Presumptions of Foreign Law,* 41 Cornell L.Q. 243, 261 (1956) [hereinafter cited as *Cornell Note* ]; Orr, *The Warsaw Convention,* 31 Va.L.Rev. 423, 434 (1945).

**20.** The court cited *Reed v. Wiser,* 555 F.2d 1079, 1092 (2d Cir.), *cert. denied,* 434 U.S. 922, 98 S.Ct. 399, 54 L.Ed.2d 279 (1977), as an example of a recent case that stressed this policy of uniformity. *Benjamins,* 572 F.2d at 917.

[a]ny liability imposed by Article seventeen of the said [Warsaw Convention] on a carrier in respect of the death of a passenger shall be in substitution for any liability of the carrier in respect of the death of that passenger either under any statute or at common law.

*Benjamins,* 572 F.2d at 919 (quoting Carriage by Air Act, 22 & 23 Geo. 5, c. 36, § 1(4) (1932)). This statute, as Judge Lumbard observed, strongly suggests that the British delegates who participated in the drafting of the convention[21] believed that the Convention carried its own cause of action. The court considered this a proper interpretive tool to support its conclusion that the Convention creates a cause of action for wrongful death.

This circuit has not been required to reexamine the question whether the Convention creates an independent cause of action since *Benjamins* was decided. In *Dunn v. Trans World Airlines, Inc.,* 589 F.2d 408, 411–12 (9th Cir.1978), we noted that *Benjamins* contradicts the previous majority rule, but we found no necessity to determine whether *Benjamins* should be followed. With the history just discussed as a background, we must now resolve that question. Like the court in *Benjamins,* we conclude that the Convention creates an independent cause of action for wrongful death, a cause of action founded in federal treaty law.

We agree with the reasons given by the Second Circuit for its decision in *Benjamins.* Our judgment also rests upon several considerations that *Benjamins* did not mention.

First, the structure and text of the Warsaw Convention itself indicates that the Convention is intended to supply a cause of action to injured passengers. *Benjamins* pointed to article 30(3) as evidence to support this proposition; we find other Convention articles persuasive as well. Most important, of course, are the words of article 17, which state that "[t]he carrier *shall be liable* for damage sustained in the event of the death or wounding of a passenger" (emphasis added). The normal meaning of this phrase is that a passenger injured during international air transportation may maintain an action to impose liability on the carrier. Only by a strained reading can article 17 be interpreted to mean that signatory nations do not by ratifying the Convention create a cause of action under their national law, but rather merely create a presumption of liability to be employed in whatever actions may be available under other domestic law. But since the latter interpretation of article 17 is not completely implausible, we examine the remainder of the Convention to discern which interpretation is more consistent with the Convention's overall scheme.

In this connection, article 29 assumes particular relevance. Article 29 states: "(1) The right to damages shall be extinguished if an action is not brought within 2 years, reckoned from the date of arrival at the destination, or from the date on which the aircraft ought to have arrived, or from the date on which the transportation stopped." That the Convention incorporates such a statute of limitations implies that the Convention also establishes a right of action subject to the limitation period. Had the Convention draftsmen meant to employ domestic law as the source of a plaintiff's right of action, they could have been expected to leave the determination of a limitations period to domestic law as well.

It is important also that article 29 speaks of "the right to damages," as if that right is already assured by virtue of the Convention. In fact, the official French language text of the Convention illustrates this point even more clearly. The first portion of article 29 in the French text reads, "[l] 'action en responsabilité doit être intentée, sous peine de déchéancé, dans le délai de deux ans...." 49 Stat. at 3007, T.S. No. 86, at 8, 137 L.N.T.S. at 28. A literal translation of this language would be, "[t]he action for liability must be brought within two years, else it lapses." By speaking in this way of "*the* action for liability,"[22] and not merely in terms of "*an* action for liabili-

---

21. The United States did not participate in the drafting of the Warsaw Convention.

22. In French, "l'action en responsabilité." Had the drafters intended to say "an action for

ty subject to the Convention," the article shows that the Convention creates a cause of action. Nor is this language in article 29 merely an isolated instance. Articles 27 and 28 also refer in identical phrasing to "the action for liability." [23]

The textual provision most frequently cited to support an argument that the Convention does not create its own cause of action is article 24, which states:

(1) In the cases covered by articles 18 and 19 any action for damages, however founded, can only be brought subject to the conditions and limits set out in this convention.

(2) In the cases covered by article 17 the provisions of the preceding paragraph shall also apply, without prejudice to the questions as to who are the persons who have the right to bring suit and what are their respective rights.

One delegate considered this provision to be "the very substance of the Convention, be-

cause it excludes recourse to common law" for a cause of action against the carrier. *Minutes of the Second International Conference on Private Aeronautical Law, October, 1929, Warsaw* 213 (R. Horner & D. Legrez trans. 1975) (statement of British delegate Sir Alfred Dennis) [hereinafter cited as *Warsaw Minutes*]. Nevertheless, it has been argued that the statement in article 24(2) that article 17 operates "without prejudice to the questions as to who are the persons who have the right to bring suit and what are their respective rights" shows that the Convention does not create a right to wrongful death recovery. Judge Van Graafeiland, dissenting in *Benjamins,* reasoned that the absence of these elements of a wrongful death cause of action precludes finding such a cause of action in the Convention. 572 F.2d at 921.

We have considered the context and the history [24] of the "without prejudice" lan-

---

liability," it is much more likely that they would have used the phrase "une action en responsabilité." *Cf.* Warsaw Convention, art. 1 (official text) ("une entreprise de transports aériens"); *id.,* art. 17 ("un voyageur"); *id.,* art. 22 (1) ("une convention spéciale avec le transporteur"); *id.,* art. 33 ("un contrat de transport").

The word "responsabilité" has been translated as "damages" in the English version. However, "liability" is the more literal translation, and in any case the distinction is without significance.

**23.** The official text of article 27 reads:
En cas de décès du debiteur, l'action en responsabilité, dans les limites prévues par la présente Convention, s'exerce contre ses ayants droit.
49 Stat. at 3007, T.S. No. 876, at 8, 137 L.N.T.S. at 27.
The relevant portion of the official text of article 28 reads:
(1) L'action en responsabilité devra être portée, au choix du demandeur, dans le territoire d'une des Hautes Parties Contractantes, soit devant le tribunal du domicile du transporteur, du siège principal de son exploitation ou du lieu ou il possède un établissement par le soin duquel le contrat a été conclu, soi devant le tribunal du lieu de destination.
*Id.* For reasons nowhere explained, the phrase "l'action en responsabilité" has been translated, apparently inaccurately, to read "an action for damages" rather than "the action for damages" in the English language version of the

Convention. *See* 49 Stat. 3020, T.S. No. 876, at 23, 137 L.N.T.S. at 27.

**24.** The history of article 24 tends to show that the delegates intended the cause of action created by the Convention to survive the death of the passenger who holds the cause of action in the first instance. In the original working draft, the article stated:
In the cases provided for in Article 21 [the present article 17], even in the case of death of the interested party, any liability action, however founded, can be brought only under the conditions and limits set forth by the present Convention.
*Warsaw Minutes* at 265. According to one of the conference delegates, this provision was intended to ensure, among other things, that the right to recover would not be terminated by the death of an "interested party," as the drafters realized might otherwise happen under English law. *See* Riese, *Observations sur la Convention de Varsovie rélative au droit privé aérien,* 14 Droit Aérien 216, 219 n. 1 (1930) [hereinafter cited as *Riese*]. When the article was considered by the conference delegates, they decided for other reasons to reorganize its phrasing, and the "in case of the death of the interested party" language was deleted. *See Warsaw Minutes* at 211–14, 229. The rule that the right of action survives the death of the person liable as carrier was made the subject of a separate provision, article 27. *See supra* note 23. There is no indication that by so doing the delegates meant to reject the converse principle

guage of article 24(2), and we conclude that it is best explained as the result of uncertainties among the Convention delegates concerning certain attributes of the right that they meant to create. The delegates realized that several claimants might attempt to collect damages on behalf of a single dead passenger and that they might institute suit in different forums. *See Warsaw Minutes* at 116–17. Henri de Vos, Reporter for the Warsaw Conference, explained in his report that while the forum issue had been resolved in the working draft, the question of who are "the persons upon whom the action devolves in the case of death" was to be left to local law apart from the Convention. This, we believe, is the true import of article 24(2). The "without prejudice" language does not in any way tend to contradict the existence of a cause of action in the Convention for injured passengers;[25] the only question is whether the indefiniteness of the article as to the identity of persons entitled to recover precludes finding that any such cause of action survives in the event of the passenger's death.

The early decisions that laid down the rule that the Convention does not independently allow wrongful death recovery were founded upon the doctrine that under our common law system, no wrongful death action can be maintained in the absence of specific statutory authority. *See Choy v. Pan American Airways Co.,* 1941 Am.Mar.

Cas. 483, 488 (S.D.N.Y.); *Wyman v. Pan American Airways, Inc.,* 181 Misc. 963, 43 N.Y.S.2d 420, 423 (Sup.Ct.1943) *aff'd,* 293 N.Y. 878, 59 N.E.2d 785 (App.Div.), *cert. denied,* 324 U.S. 882, 65 S.Ct. 1029, 89 L.Ed. 1432 (1944); *see also Noel v. Linea Aeropostal Venezolana,* 247 F.2d 677, 679 (2d Cir.) (citing *Wyman* and authorities that rely on *Choy*), *cert. denied,* 355 U.S. 907, 78 S.Ct. 334, 2 L.Ed.2d 262 (1957); *Komlos v. Compagnie Nationale Air France,* 111 F.Supp. 393, 399 (S.D.N.Y.1952) (quoting *Wyman*), *rev'd on other grounds,* 209 F.2d 436 (2d Cir.1953). We consider highly significant the fact that the Supreme Court has now rejected this premise.

In *Moragne v. States Marine Lines, Inc.,* 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970), the Court considered a situation in which a longshoreman had been killed while working aboard a vessel within Florida's territorial waters. *Id.* at 376, 90 S.Ct. at 1775. The defendants in the case moved to dismiss on the ground that federal statutory law provided no recovery for wrongful death within a state's territorial waters, and that Florida's wrongful death statute did not recognize unseaworthiness as a theory of recovery. *Id.* The court rejected this argument and ruled that a wrongful death action could be maintained by the decedent's representatives under federal maritime law even absent specific statutory authorization. In a sweeping

---

inherent in the initial phrasing, that a passenger's right of action survives his death.

**25.** One other aspect of article 24 merits brief attention. The language of article 24(1) that any action, "however founded," must be brought subject to the conditions and limits of the Convention, might be taken to mean that an action must be "founded" on some law other than the Convention. *See Benjamins,* 572 F.2d at 922 (Van Graafeiland, J., dissenting). G. Nathan Calkins argued that the phrase "conditions and limits" should more properly be translated as "terms and limits," and that the article so read supports the existence of a cause of action for wrongful death. Calkins, *The Cause of Action Under the Warsaw Convention,* 26 J.Air.L. & Com. 217, 226 & n. 2 (1959). We agree with the Second Circuit that Calkins's argument is inconclusive. *See Benjamins,* 572 F.2d at 918.

The best explanation for the wording of article 24(1) appears to be that the delegates did not intend that the cause of action created by the Convention to be exclusive. For example, in the United States, state law causes of action may be invoked by plaintiffs injured during international air transportation. Such causes of action might, consistently with the Convention, provide varying measures of damages or varying specifications of persons entitled to recover. *Cf. In re Aircrash in Bali,* 684 F.2d 1301, 1311 & n. 8 (9th Cir.1982) (any cause of action created by Warsaw Convention is not exclusive). The delegates used article 24(1) to ensure that neither the liability limits of the Convention nor its limitation period could be circumvented by resort to such an alternative legal basis of action. *See Riese* at 219–20; *Warsaw Minutes* at 213 (remarks of Sir Alfred Dennis).

opinion, Justice Harlan writing for a unanimous court overruled *The Harrisburg* and other nineteenth century cases that refused to allow wrongful death actions absent a statute. He concluded that the "barbarous" common law rule against wrongful death recovery has been universally abrogated by statute that the contrary rule should now be considered "part of the general law." *Id.* at 381, 388–392, 90 S.Ct. 1777, 1781–1783 (quoting Pound, *Comment on State Death Statutes—Application to Death in Admiralty,* 13 NACCA L.J. 188, 189 (1954)).

The Court in *Moragne* considered the same issue here presented, whether the difficulty of ascertaining persons entitled to recover precludes finding a wrongful death cause of action without statutory definition. The Court held that this problem does not prevent finding a generalized right to wrongful death recovery. *Id.* at 406–08, 90 S.Ct. at 1790–92. It ruled that a court presented with such an issue may properly look to other more specific federal statutes for guidance, and observed that "a suit for wrongful death raises no problems unlike those that have long been grist for the judicial mill." *Id.* at 408, 90 S.Ct. at 1792. *See also Sea-Land Services, Inc. v. Gaudet,* 414 U.S. 573, 94 S.Ct. 806, 39 L.Ed.2d 9 (1974).[26]

■ Taking guidance from *Moragne,* we hold that the Warsaw Convention creates a cause of action for wrongful death, and that the questions of who are the persons entitled to assert that cause of action and what are their respective rights may be determined by reference to other federal statutes. Because no issue of this kind has been raised in the present case, we leave to future courts the task of determining the most appropriate analog.[27] *See Moragne,* 398 U.S. at 408, 90 S.Ct. at 1791–92.

Of the arguments against finding a cause of action in the Convention, there remains for us to consider only the contention, based on Secretary Hull's letter to President Roosevelt, that the Convention creates a "presumption of liability." The most immediate observation, made by the court in *Benjamins,* is that Secretary Hull's statement that article 17 creates a presumption of liability does not contradict the hypothesis that the article also creates a cause of action. "We do not believe that the passing remark of Secretary Hull in a lengthy letter was intended to state the total of what Article 27 might provide." *Benjamins,* 572 F.2d at 919. Secretary Hull's statement was made in the context of a paragraph discussing the substantive rules governing liability under the Convention. *See supra* note 16. It is not unnatural that Secretary Hull chose to frame his remark about article 17 in terms of the provision's impact on those substantive rules. The Secretary perhaps did not consider it necessary to address the more basic question whether the Convention creates a separate cause of action pursuant to which the substantive liability rules may be implemented. Indeed, other parts of Hull's letter suggest that he may well have presupposed that such a right existed. For instance, Secretary Hull comments that the Convention will afford "a more definite basis of recovery." Letter from Secretary of State Hull to President Roosevelt, *reprinted in* 1934 U.S. Av.Rep. 239, 242.

Whatever the significance to be accorded Secretary Hull's letter, we conclude that it does not outweigh the repeated insistence by drafters of the Convention that the cardinal purpose of the agreement is to ensure the existence of a uniform and universal system of recovery for losses incurred in the

**26.** For a commentary that *Moragne* weighs heavily in favor of finding a cause of action in the Convention, *see* Note, *Finding a Cause of Action for Wrongful Death in the Warsaw Convention: Benjamins v. British European Airways,* 40 Ohio St.L.J. 277, 286–88 (1979).

**27.** The Court in *Moragne* suggested as potential reference points the Jones Act, 45 U.S.C. § 51, the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 909, and particularly the Death on the High Seas Act, 46 U.S.C. §§ 761, 762. 398 U.S. at 407–08, 90 S.Ct. at 1791–1792.

course of international air transportation.[28] See, e.g., Warsaw Minutes at 417 (remarks of French delegate Ripert) (Convention imposes a "compulsory system of liability" on air carriers); id. at 66 (Ripert) (application of national law would "destroy" the Convention); id. at 169 (British proposal to allow courts not to act when to allow recovery would be contrary to national law rejected). If the Convention did not provide a separate cause of action for wrongful death, then a plaintiff otherwise entitled to recover according to the rules of the Convention could conceivably be prevented from recovering due to the absence of the necessary rule of local law. That such a departure from the principle of universal recovery where authorized by the Convention would be antithetical to the spirit of the Convention is illustrated by an incident that occurred during the Warsaw Conference. Delegate Motono of Japan introduced an amendment to the Convention that would have reserved to the contracting states the power to derogate from the liability limits of the Convention by national legislation. Concerning the Japanese proposal, the Reporter of the Convention's comment was "very clear and very brief: It is absolutely impossible to accept this amendment; it would be to overturn completely the essence of the present draft." Warsaw Minutes at 35 (Remarks of Reporter De Vos). The British delegate stated that "the sole reason which [Great Britain] has for entering into this Convention is the desire to achieve uniformity. If the Conference adopts the point of view of Japan,

we miss the point." Id. (remarks of Sir Alfred Dennis). The amendment was rejected by all nations except Japan. Id. at 35.[29] To read the Convention in a way that would allow national law to prevent wrongful death recovery would have a potential effect similar to the Japanese amendment. We decline to so hold; instead we interpret the Convention to create any necessary cause of action for wrongful death.[30]

b. *Is the Warsaw Convention Cause of Action for Wrongful Death Available to the Plaintiffs?*

Having concluded that the Warsaw Convention creates a cause of action for wrongful death independent of the provisions of California law, we must next consider whether that cause of action is available to the plaintiffs in this case. The issue arises because the plaintiffs' decedents were not ordinary fare-paying travelers but employees of Western Airlines, the carrier.

■ To conduct this inquiry, we turn once more to article 17 of the Convention, which states that "[t]he carrier shall be liable for damage sustained in the event of the death or wounding of a *passenger*" (emphasis added). The mere presence of the plaintiffs' decedents aboard the aircraft was not enough to bring them within the coverage of the Convention. For the plaintiffs to recover, the decedents had to qualify as "passengers" within the meaning of article 17.

The appellants rely on article 1 of the Convention to show that they fall within

---

28. Even those who have argued against the existence of a cause of action in the Warsaw Convention have agreed that uniformity of procedure and remedies is the dominant purpose of the Convention. See, e.g., *Benjamins*, 572 F.2d at 922 (Van Graafeiland, J., dissenting); *Noel*, 247 F.2d at 679; *Cornell Note*, 41 Cornell L.Q. at 259.

29. This incident is described in more detail and its significance is elaborated in Calkins, *The Cause of Action Under the Warsaw Convention*, 26 J.Air.L. & Com. 217, 227–28 (1959).

30. Our result, endorsing the decision in *Benjamins*, accords with the majority of commentators who have assessed that decision. *Compare* 19 Va.J.Int'l.L. 183, 196 (1978) (criticizing

*Benjamins* for lack of textual basis and questioning necessity of decision) *with* Note, *Finding a Cause of Action for Wrongful Death in the Warsaw Convention: Benjamins v. British European Airways*, 40 Ohio St.L.J. 277, 294 (1979) (finding *Benjamins* justified in light of *Moragne* and *Gaudet*); Comment, *Warsaw Convention*, 11 Vand.J.Transnat'l.L. 575, 581–82 (1978) (praising *Benjamins* for harmonizing U.S. law with foreign law); *and* Comment, *The Warsaw Convention Creates a Cause of Action for Wrongful Death—Benjamins v. British European Airways*, 38 Md.L.Rev. 120, 134 (1978) (concluding that *Benjamins* reaches a sound result).

the scope of its coverage. That article states, in part:

(1) This convention shall apply to all international transportation of persons, baggage, or goods performed by aircraft for hire. It shall apply equally to gratuitous transportation by aircraft performed by an air transportation enterprise.

Appellants contend that the decedents fall within the Convention's coverage because they were receiving "gratuitous transportation" at the time of their deaths.

■ In the cases of appellants Haley and Tovar, we conclude that the argument sweeps too broadly. Decedents Theresa Haley and Regina Tovar were indisputably working as flight attendants on board Flight 2605. Even though Haley and Tovar were in some sense "transported" by the plane, we do not think that they received "transportation" as "passengers" within the meaning of the Convention.[31] The term "transportation" seems to us to require as a minimum that the voyage be undertaken for the principal purpose of moving the individual from point A to point B. In the cases of Haley and Tovar, the voyages were undertaken not for this reason, but for the exclusive purpose of performing employment duties. We conclude that Haley and Tovar were not, therefore, "passengers" aboard Flight 2605, and that the summary judgments in favor of Western on the claims of plaintiffs Haley and Tovar were proper.

■ As to appellant Dzida, we reach a different conclusion. Western's supporting affidavit in effect admits that Vikki Dzida was not a working flight attendant on Flight 2605. Rather, the supervisor states that she was a "deadheading" employee based in Los Angeles who was traveling to Mexico City to take a duty shift aboard a plane departing from that location. The affidavit maintains that Dzida was receiving full pay and half flight time credit for her time aboard the aircraft. Even though

uncontroverted, we do not find these allegations sufficient to negative the existence of genuine issues of material fact concerning the question whether Dzida was receiving "transportation" as a "passenger" aboard the flight. Therefore, we conclude that summary judgment as to plaintiff Dzida was improper. See Fed.R.Civ.P. 56(e) advisory committee note.

In *Demanes v. United Air Lines*, 348 F.Supp. 13 (C.D.Cal.1972), Judge Pregerson, then District Court Judge, considered a situation strikingly similar to the present one. The plaintiffs in that case were the representatives of four United pilots who were killed in an air crash while "deadheading" aboard a United flight between Los Angeles and Denver. The issue was whether these pilots were limited to worker's compensation remedies under applicable state law because they were acting "within the course and scope of their employment when they died." *Id.* at 14. Judge Pregerson ruled that these pilots were "passengers" for purposes of the airline's liability for injury or death, and that they were not, therefore, subject to the worker's compensation statute, even though they were receiving half-pay and half-flight time credit for their time aboard the flight. *Id.*

■ Although the precise legal question is slightly different, a similar analysis may well apply in Dzida's case. Certainly, the record is not sufficiently developed to show that Vikki Dzida was *not* as a matter of law a "passenger" aboard the ill-fated aircraft. It does not reveal whether she was commuting from her home to her job assignment. *Cf. id.* (fact that pilots were commuting was critical to determination that they were not acting as employees). It also does not tell whether Dzida was contractually obligated to be on board Flight 2605, or whether she was free to choose any method of transport that would get her to Mexico City in time to assume her duty assignment. If the latter situation prevailed, we believe that

---

**31.** Article 1 refers to persons who receive "transportation," while article 17 by its terms applies to "passengers." For purposes of logical consistency, we read "passengers" under article 17 to be all persons who receive "transportation" under article 1 as we here define that term.

Dzida qualified as a "passenger" covered by the Convention. The ultimate inquiry is whether Dzida was on Flight 2605 for the primary purpose of traveling from Los Angeles to Mexico City, so that she was a "passenger," or whether she was aboard the flight primarily to perform (or to be on call to perform) her employment obligations, so that she was not a "passenger." [32] This inquiry is entirely separate and distinct from the question whether appellant Dzida would or would not be able to collect worker's compensation recovery under state law.

[11] As one final argument in favor of sustaining the summary judgment below, Western contends that any cause of action available to the plaintiffs under federal law does not displace the provisions of California's worker's compensation law that purport to establish an exclusive remedy for the death of a covered employee, citing *King v. Pan American World Airways,* 270 F.2d 355 (9th Cir.1959), *cert. denied,* 362 U.S. 928, 80 S.Ct. 753, 4 L.Ed.2d 746 (1960), and *Stoddard v. Ling-Temco-Vought, Inc.,* 513 F.Supp. 314 (C.D.Cal.1980). Even apart from the holding of *Demanes,* which directly contradicts Western's position, the argument has no merit. *King* and *Stoddard* both involved suits under the Death on the High Seas Act, a statute that expressly provides that state statutes giving or regulating any right of actions or remedies for death are not affected by its provisions. 46 U.S.C. § 767 (1976); *see King,* 270 F.2d at 362. The Warsaw Convention contains no such proviso. It therefore preempts the exclusivity of the California worker's com-

pensation statute for the same reason it would preempt any provision of local law that purported to limit the recovery allowed by the Convention. *See supra* Part 2(a). The summary judgment entered against appellant Dzida was erroneous and must be reversed.

### 3. *Dual Capacity Doctrine.*

The final contention raised by the plaintiff-appellants is that they should be allowed to maintain actions against Western in its capacity as a designer or manufacturer of the airplane that crashed pursuant to the "dual capacity" doctrine of California law. In the cases of appellants Haley and Tovar, dismissal of the state law claims was proper because all federal claims were properly dismissed before trial. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966). In the case of appellant Dzida, pendent jurisdiction over the state law claim may be permissible, since he may have stated a federal claim that requires trial. We decline to decide the question whether pendent jurisdiction is proper under *Gibbs.* The district court will resolve the issue on remand. *See Benjamins,* 572 F.2d at 919.

### CONCLUSION

The summary judgments of dismissal in numbers 81–5695 and 81–5724 are AFFIRMED. The judgment in number 81–5721 is REVERSED and REMANDED for further proceedings.[33]

---

**32.** Our holding that the Convention does not apply to employees of the carrier actually on duty but that it does apply to employees supplied with transportation to their assigned place of duty is identical to the conclusion of the only commentator who we can find to have considered the issue. *See* D. Goedhuis, *National al Airlegislations and the Warsaw Convention* 129–30 (1937). While Goedhuis refers to Riese as endorsing a contrary view, we have examined the cited source and are unable to discern any discussion of the subject. *See Riese* at 223–26 (discussing "Personnes Ayant Droit á une Indemnité").

**33.** Appellant Dzida additionally asserted a claim on behalf of Vikki Dzida against Western

for property damage. If decedent Dzida and her luggage are found to be within the scope of article 1 of the Convention, and if her luggage was "registered" within the meaning of article 18, then appellant Dzida is entitled to recover on this claim as well.

The claims for property damage filed by appellants Haley and Tovar were properly dismissed. The Warsaw Convention applies only to international "transportation" of baggage and goods, as well as persons. Warsaw Convention, art. 1. In light of our conclusion above that decedents Haley and Tovar were not themselves receiving "transportation" within the meaning of the Convention, we further conclude that no personal belongings they were carrying were the subject of "international

transportation" as that term is used in the Convention. Appellants Haley and Tovar can-

not, therefore, avail themselves of a cause of action under article 18 of the Convention.